IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2024 Session

**STATE OF TENNESSEE v. JOSEPH RAY DANIELS**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2018-CR-263   David D. Wolfe, Judge**

———————————————

**No. M2023-00158-CCA-R3-CD**

———————————————

The Defendant, Joseph Ray Daniels, confessed to the beating death of his five-year-old son, Joseph Clyde Daniels III, and was convicted by a jury of second-degree murder, first-degree felony murder, aggravated child abuse, making a false police report, and tampering with evidence. He subsequently received an effective sentence of life imprisonment.[1] In this appeal, the Defendant argues the trial court erred in denying his motion to suppress his confession (1) because the State failed to corroborate his extrajudicial confession under the modified trustworthiness standard outlined in State v. Bishop, 431 S.W.3d 22 (Tenn. 2014), and (2) because his post-polygraph video recorded statement was obtained by law enforcement through coercive interrogation techniques including an express promise of leniency. The Defendant also argues the trial court abused its discretion in failing to exclude as hearsay utterances by the victim's three-year-old brother, "Joe dead, Joe dead, Joe dead," and the response of his aunt, "Yes baby, Joe dead;" and in failing to exclude as not relevant and unfairly prejudicial Facebook messages his wife exchanged with a paramour leading up to the victim's death. We affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Remanded for Entry of Corrected Judgment**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined.

M. Todd Ridley and Brennan M. Wingerter, Assistant Public Defenders – Appellate Division (on appeal); William B. Lockert, District Public Defender, and Matt Mitchell and Drew Taylor, Assistant Public Defenders (at trial), for the appellant, Joseph Ray Daniels.

---

[1] The judgment form for count one erroneously reflects the Defendant was convicted of first-degree murder. We acknowledge that count one merged into count two of felony murder; however, we remand for entry of corrected judgment to reflect the conviction offense of second-degree murder.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Ray Crouch, District Attorney General; and Josh Turnbow, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Sometime after going to bed on April 3, 2018, the victim, the Defendant's developmentally delayed five-year-old son, urinated on the floor of his grandfather's bedroom. When the victim's eight-year-old brother, Alex Nolan ("Alex"), alerted the Defendant, the Defendant beat the victim, and the two boys went back to bed. Later that night, Alex was awoken by a loud bang that "sounded like a thump." He went to the living room and saw the victim lying on the ground with the Defendant standing over him. The Defendant had beaten the victim, picked him up, and carried him out the door. Alex never saw the victim alive again. At around 6:20 the next morning, the Defendant reported the victim missing. Later that day, in the presence of an officer, the victim's three-year-old brother, Noah Daniels ("Noah"), uttered, "Joe dead, Joe dead, Joe dead," and the victim's aunt, Joyce Austin (Aunt Joyce), responded, "Yes baby, Joe dead." Two days later, after providing law enforcement with various statements, the Defendant confessed to beating the victim to death, dumping his body, and named Alex as an eyewitness. Despite massive law enforcement and volunteer efforts, the victim's body was never recovered.

Subsequent investigation revealed that the Defendant's wife exchanged a series of sexually explicit Facebook messages with a former sexual partner in the weeks leading up to the victim's death. Based on these messages, the State theorized the Defendant either lost control while punishing the victim or killed the victim, for whom his wife received and relied on financial support from the State, to prevent his wife from leaving him. On June 7, 2018, a Dickson County Grand Jury charged the Defendant with five offenses via presentment: first-degree premeditated murder (count one), first-degree felony murder (count two), aggravated child abuse (count three), making a false police report (count four), and tampering with evidence (count five).

The record in this case is extensive, and we summarize the evidence adduced at the Defendant's June 3-12, 2021 jury trial as relevant to the issues raised in this appeal. Law enforcement arrived at the Defendant's home approximately ten minutes after the Defendant reported the victim missing. Shortly thereafter, Detective Sarah McCartney of the Dickson County Sheriff's Office ("DCSO") spoke with Alex, who told her he "didn't really know what happened" other than that the victim "had an accident during the night and had urinated in [sic] the floor." Around six hours after the Defendant reported the victim missing, the Defendant asked to have the trunk of his car searched. Sergeant Trevor

- 2 -

Daniel searched the trunk, which was empty, but later testified it was odd that the Defendant had waited so long to request the search. Later that afternoon, as two officers were filling out a "Lost Person Questionnaire" with Aunt Joyce in the living room, Noah barged in and "stated or asked, 'Joe dead, Joe dead, Joe dead.'" Aunt Joyce immediately replied, "Yes baby, Joe dead." The two officers looked at each other but said nothing before continuing the questionnaire. A third officer overheard the exchange but could not see Noah or Aunt Joyce. No one followed up with them to discuss their comments.

Law enforcement officers were initially unable to interview the Defendant because the Defendant drove off shortly after they arrived at his house and did not return for nearly two-and-a-half hours. The Defendant later said he was looking for the victim. The Defendant subsequently provided four statements to law enforcement.

Sergeant Daniel took the Defendant's first statement after he returned from his drive the morning the victim was reported missing. The Defendant said he woke up around 5:30 a.m. and "went to the boys' bedroom to get Alex and [the victim's] clothes." When he noticed the living room coffee table was rotated 90 degrees from its normal position, "he looked immediately at the [backdoor padlock] and noticed it was gone." The Defendant said he then noticed the victim was missing. After Sergeant Daniel searched the Defendant's trunk, Detective McCartney asked the Defendant if he could show her where he went when he drove off to search for the victim. The Defendant agreed to ride along with her and another detective. He gave his second statement during the ride-along, the audio of which was recorded and later transcribed. The State entered the transcription into evidence during Detective McCartney's direct examination.

In his second statement, the Defendant said the victim had a propensity to leave the house unsupervised but had never made it farther than the house across the street. The Defendant said, "[I]t's something about [the victim] that he just wants to escape." For this reason, the family blocked the front door from the inside with a large hutch and installed a latch at the top of the back door to keep it locked from the inside with a padlock. The Defendant said he woke up that morning to find the coffee table had been moved and the padlock missing. The Defendant claimed he then looked "everywhere through the house" but "couldn't find" the victim, so he woke his wife and drove around the neighborhood looking for the victim before calling the police. When asked to clarify who else was in the car, the Defendant said it was Alex, not his wife. The Defendant also reported that the victim was wearing black pajamas with skeletons on them when he went missing and not wearing shoes or socks.

The detectives then asked if the victim could unlock the padlock on his own. The Defendant said he was not sure because he had never "seen [the victim] unlock the door,"

but the victim had been "progressing and doing things better" lately. The detectives also asked if anything unusual happened or whether the children had got in trouble that evening. The Defendant initially said nothing happened. However, when Detective McCartney informed the Defendant that Alex told her the victim urinated on the floor, the Defendant admitted that Alex woke him up to tell him the victim had had an accident. The Defendant said that he told the victim to go back to bed but did not yell at him or scold him. When asked why he wanted his trunk searched, the Defendant said the victim could open and close the trunk on his own and may have been hiding inside. Eventually, they returned to the Defendant's house and ended the conversation.

The Defendant gave a third statement later that afternoon after being asked about the latch on the back door. The Defendant explained it was meant to keep the victim from running away. When asked if the latch was locked that morning, the Defendant said he found the lock in the children's toy box, a fact he had not yet divulged. He theorized that the victim "pushed [the coffee] table over, climbed on top the table, found the key and unlocked it. [Then he] must have pushed that table back to where it was and exited . . . while [everyone was] asleep."

The Defendant gave his fourth statement at around 8:30 o'clock the same night. The Defendant told investigators that Alex woke him up in the middle of the night to tell him the victim had urinated on the floor. The Defendant said he noticed the coffee table had been moved when he woke up again that morning, but he "didn't look at the [latch on the back] door" right away and instead began looking for the victim. He also said that he found the back door padlock in Noah's toys. Sergeant Daniel noticed inconsistencies between the Defendant's first and fourth statements but testified that they were not "earth[-]shattering."

Two days after the Defendant reported the victim missing, the Defendant arrived at the Dickson County Police Department for the April 6, 2018 video recorded interview at issue in this case. The Defendant drove to the interview of his own free will, and the police did not order him to submit to questioning. The interview consisted of three parts: a preliminary interview, a polygraph test, and a post-polygraph interrogation. At no point was the Defendant handcuffed, restrained, or told he was under arrest. Assistant Special Agent Ronnie Faulkner of the Tennessee Bureau of Investigations ("TBI") administered the polygraph and was the only person in the room with the Defendant during the first two parts of the interview. TBI Special Agent Joey Boyd joined them for the post-polygraph interrogation.

The trial court granted the Defendant's motion to suppress his polygraph results, and the jury was only shown a redacted version of the video and a transcript with references

- 4 -

to the polygraph results omitted. The State admitted the unedited video recording as evidence during the pre-trial suppression hearing and the redacted recording at trial. The unredacted video was over four hours long, and the redacted video was approximately two and a half hours. The Defendant's polygraph results are only referenced herein to provide context for testimony at the pre-trial voluntariness hearing.

Agent Faulkner began the preliminary interview by advising the Defendant of his Miranda rights, which the Defendant waived by signing a "Warnings as to Constitutional Rights" form. When Agent Faulker told the Defendant he was free to leave at any time, the Defendant responded, "I want to do this so that way there's no suspicion that I've done something," and signed a form consenting to the polygraph test. The Defendant said he had bipolar disorder type-one and was prescribed a variety of psychiatric medications. He also reported that he got about nine hours of sleep before the interview, that he had taken his medications as directed, and that he rated his overall health as good.

Agent Faulkner asked the Defendant to summarize the events leading to the victim's disappearance. The Defendant gave the same version of events described in his previous statements. He reiterated his theory that the victim moved the coffee table and climbed it to unlock the back door. At the same time, everyone was asleep, and the Defendant insisted that he did not discipline or spank the victim after he urinated on the floor. Agent Faulkner then administered the polygraph test, and Agent Boyd joined them for the post-polygraph interrogation.

Agent Faulker began the post-polygraph interrogation by saying the Defendant's polygraph results showed he was "not being truthful." Over the next hour, Agents Boyd and Faulker repeatedly insisted the Defendant was not telling the truth as the Defendant reiterated his original story. Agent Boyd then said:

> I wish you would believe me when I told you that no matter what you tell me right now, you tell me the truth, and you will walk out that door. You're walking out of here, okay? I promise you. I can promise you that. No matter what you say to me right now, you're walking out that door.

The Defendant maintained his prior version of events for another twenty minutes before he broke down crying and said, "I let [the victim] out." The Defendant said he was "mad" the victim had urinated on the floor, so he unlocked the back door and told him to go outside. The Defendant said his wife was unaware he let the victim out but struggled to explain why she told investigators she saw the victim asleep in bed when she checked on him that night. The Defendant insisted he did not kill the victim but admitted he "may have spanked" and "yelled at" him. He also said he could not remember exactly what happened because he

- 5 -

blacked out.

As the interrogation continued, the details of the Defendant's version of events began to change. He said he was angry after seeing "the pee [on the floor]," so he "went to the living room . . . [and] unlocked the [back] door," but the victim started laughing and got out of bed, so the Defendant spanked him. The Defendant said the victim started crying but was soon laughing again, so the Defendant spanked him a second time. The Defendant said he then opened the back door and let the victim out before chasing him down, bringing him back inside, and spanking him once more. The Defendant moved the coffee table in front of the door to prevent the victim from escaping again, but somehow, he "got out a second time." The Defendant said Alex "saw everything" and admitted that he threatened to beat Alex if he told anyone what happened.

Agent Boyd asked why the Defendant wanted police to search his trunk. The Defendant said he noticed his car door was ajar and thought the victim may have climbed into the trunk. Agent Boyd also asked the Defendant what he told his wife. The Defendant initially said that he told his wife he "let [the victim] out," but when pressed further, the Defendant responded, "I beat him." The Defendant said that the beating lasted five to ten minutes, during which he threw the victim on the floor and hit him "countless times" before throwing him on the coffee table and hitting him some more. The Defendant said he hit the victim on the head "several times" and that the victim cried "pretty much the whole time." After the beating, the Defendant said he took the victim outside, and the Defendant went back to bed. At first, the Defendant insisted that the victim was still screaming and crying when he took him outside. However, the Defendant quickly admitted he only stopped the beating when the victim became unresponsive. The Defendant also said that Alex and his wife were witnesses and confirmed that he threatened to beat Alex if he told anyone what he saw.

When asked if he put the victim in his car, the Defendant said, "I know I'm going to prison" and "I don't remember doing any of this." The Defendant then said he put the victim's body in the trunk of his car, drove to a dirt logging road, and left the body in a field. Agent Boyd pulled up a satellite map on his phone, and the Defendant showed him the location of the field. The Defendant then became despondent and started crying. When Agent Boyd left the room to get the Defendant some tissues, the Defendant sobbed and exclaimed, "My God, why did I kill my son?"

When Agent Boyd returned, he asked the Defendant what he wore that night. The Defendant said he was wearing red basketball shorts and a black t-shirt with a screen-printed graphic of an alien wearing a Santa hat and a caption that said "Believe." After more questioning about where the Defendant hid the victim's body, Agent Boyd asked

what time the Defendant returned home. The Defendant responded that he returned home about thirty minutes after leaving and went back to bed around midnight. The Defendant then lamented that he "didn't mean for any of this to happen" and asked what kind of punishment he would receive for his actions. Agent Faulkner told the Defendant, "[W]e can't tell you at this point . . . that will be talked about later on[.]" Agent Boyd then told the Defendant, "I'm going to need you to come show us where [the victim's body] is, okay?" The Defendant agreed, and the interrogation ended roughly four hours after it began.

After the above videotaped confession, the Defendant provided three additional confessions. None of these confessions are contested on appeal. The first post-confession statement occurred when the Defendant was in a car with the detectives en route to where he said the victim's body could be found. The Defendant was not handcuffed or placed under arrest, and the Defendant voluntarily got into the car with Sergeant Daniel and another officer. The Defendant then guided them to the field where he said he hid the victim's body in his videotaped confession. Although the Defendant was not questioned during the ride, he made several spontaneous statements that were captured by the car's digital audio recorder, some of which were admitted into evidence at trial. Some of the Defendant's comments during the ride included, "I don't want to see him[,]" "My Dad is going to kill me" and "I want all of the donations to go to [the victim's] funeral." The Defendant also said that "Alex is a good boy" who "tells the truth[,]" because "[w]e taught him not to lie to anybody." The Defendant said he believed law enforcement had already interviewed Alex and was "pretty sure [Alex] told them everything." Although they went to the field where the Defendant said he hid the victim's body, law enforcement officers were unable to locate the victim's body. They returned to the station early morning the following day, April 7.

Once at the station, the Defendant was reminded of his Miranda rights and gave his second post-confession statement to law enforcement. The Defendant then signed a written statement typed by law enforcement based on his second post-confession statement:

> My name is Joseph Ray Daniels. I am speaking to you voluntarily today and I remember my Miranda rights from earlier. Everything I told you in the past about how I killed [the victim] is true. Also, that night I got into my car and drove down McElhiney Road and I got [the victim's body] out of the trunk. I had my wife's cell phone in my left hand using it as a flashlight and [the victim's body] was over my right shoulder. I know it was my wife's cell phone because it doesn't have a passcode and mine was still plugged in at the house charging.

Earlier that night I got woken up by Alex, who told me that [the victim] had peed on the floor. I went in and told them to get their "asses" in the bed. [The victim] started laughing. So I beat him. That's when he ran out the front door. [The victim] ran down the road. I saw a car drive by and then I ran out and got him back in the house. I beat him some more. That's when I killed [the victim]. I beat him with a closed fist and put his body in the trunk of my car, the red Chevrolet Impala. I went back in to grab a cellphone and got my wife's phone. I took that phone with me when I took [the victim] out to dump his body.

I lied to you previously about where I placed [the victim's] body. Earlier I told you it was in a field and I showed you on the map where the field was along McElhiney Road, where it turns into a dirt road. I am now telling you the truth about that part. I placed [the victim's] body in the pond right there on the right side of the dirt road where the road curves right there in the area I showed you on the map. I placed [the victim] wearing his pajamas in the pond right there.

The Defendant was arrested for first-degree murder approximately thirty minutes later.

The Defendant gave his third post-confession statement to law enforcement later that day when he told police that he had thrown the victim's body off a bridge in Hickman County with the word "Piney" next to it. Law enforcement drove the Defendant to multiple bridges in Hickman County, including one that crosses the Piney River, which the Defendant identified as the correct bridge with "eight out of ten" certainty. However, law enforcement found no evidence that a body had been thrown off any of the bridges they visited that day. On the way back to jail, the Defendant said he "lied and that he couldn't remember where the child was located." However, the Defendant confirmed that he beat the victim, that he put the victim in the trunk of his car, and that Alex witnessed what happened.

Alex, who was eleven years old at the time of trial, testified that he last saw the victim alive on April 3, 2018, the day before he was reported missing. Alex confirmed that the victim urinated on the floor that night, that the Defendant beat the victim after Alex told him what happened, and that the two boys then went back to bed. Sometime later, Alex was awoken by a loud bang that "sounded like a thump." Alex testified that he "waited for things to cool down" before leaving the bedroom. After "a couple of minutes," he went to the living room and saw the victim lying on the ground. The Defendant "had beaten [the victim]" and was "about to pick him up and carry him out the door." Noah and Aunt Joyce were in the living room, and the Defendant's wife watched from behind a

kitchen cabinet. The Defendant then picked up the victim's body and carried it outside through the back door. Alex snuck outside to follow the Defendant shortly after that.

Once outside, Alex snuck over to the edge of the house and saw the Defendant in the backyard, kneeling next to the victim's body. The Defendant eventually noticed Alex and threatened to kill him if he "didn't help[.]" Alex then opened the front door and trunk of the Defendant's car. The Defendant ignored the car and told Alex to go back inside. Alex hid on the porch and watched the Defendant carry the victim's body down the street before disappearing into the darkness. Alex returned inside and noticed that Noah and Aunt Joyce had been watching through the front window. The Defendant woke Alex the next morning and told him the victim had run away. The Defendant then took Alex for a drive around the neighborhood, ostensibly to look for the victim. Alex said he did not see Noah or Aunt Joyce that morning or go to school that day. Alex also testified he had never seen the victim move the living room coffee table alone, except when he accidentally bumped it. Additionally, although the victim could climb various objects, Alex had never seen him do so to unlock something.

The Child Advocacy Center for the Twenty-Third Judicial District of Tennessee ("CAC") interviewed Alex twice in the days following the victim's death. Both interviews were recorded on video. Alex's first CAC interview took place on April 5, 2018, one day after the Defendant reported the victim missing and one day before the Defendant's confession. On cross-examination and in response to being shown certain unidentified portions of a video interview, Alex testified that he told law enforcement "a false story" during the initial investigation. Defense counsel played portions of the video from Alex's first interview and asked Alex if he was being truthful at the time. Alex said he "was lying about" the Defendant "calmly" telling the victim to go back to bed after he urinated on the floor. Alex said he lied "because he didn't want [the Defendant] to get in trouble." Alex testified that he only changed his story because his memory of the victim's death had been "blocked off" until he finally remembered what happened a couple of months before trial. Alex testified that CAC interviewed him "a little over 50 times," most of which were not recorded. He also confirmed that no one told him how the victim died before trial.

Defense counsel then played clips from Alex's second recorded CAC interview, from April 9, 2018, three days after the Defendant confessed. Alex refuted defense counsel's insinuation that the interviewer planted the idea of the Defendant beating the victim to death in his mind. Alex confirmed that, during the interview, he said he was asleep when the victim went missing and that the interviewer told him at least four times that he had seen the Defendant beating the victim. Alex said the story he told the interviewer was "obviously a lie" and that he "just wanted to get out of there." On redirect, Alex said that most of his CAC interviews were conducted by a different interviewer than

his first two interviews and that he had not been interviewed in nearly two years. Alex testified that he no longer wanted to protect the Defendant. He also asserted that his trial testimony was truthful despite the lies he told during his CAC interviews.

On redirect, the trial court granted the State's motion to enter the videos into evidence. The first interview reflects that Alex said he did not know where the victim was but speculated that the victim ran away to find his "nanny," Belle Daniels, who was married to the victim's grandfather and was then out of town. Alex confirmed that the victim urinated on the floor the night he went missing and said the Defendant told them both to go back to bed "in a quiet and calm voice." Alex insisted that he was asleep when the victim went missing. Alex speculated that the victim escaped by moving the living room coffee table and climbing it to unlock the back door. He also denied being coached by the Defendant before the interview.

In Alex's second recorded CAC interview that occurred on April 9th, Alex said he knew the Defendant had confessed to killing the victim. Alex said the Defendant's initial missing person report was "a hoax." Despite being told the Defendant named him as a witness in his confession, Alex said he was asleep when the victim was killed and did not see what happened to the victim or know where the victim's body was hidden. Alex also denied being threatened by the Defendant.

About fifty minutes into the second CAC interview, the details of Alex's story began to change. Alex said he saw the Defendant dragging the victim's unresponsive body somewhere "outside the house." Alex also said that Noah "saw everything I saw" and "tried to stop [the Defendant]." Alex said, "Noah protected [the victim] for a few hits, but then Noah woke up, so [I] went back to bed." The interviewer asked Alex to clarify if he saw the Defendant hit the victim and if Noah tried to intervene, to which Alex responded, "Noah stopped it for a few hits, I guess."

The interviewer then asked where the Defendant hit the victim. Alex responded, "You see, I don't know because as soon as Noah defended him for those two times, it sort of got rid of me." Alex said there was a "person with [the Defendant] and . . . they were both just standing there and . . . no one dodged their hits." Alex said this person was "standing right beside" the Defendant as he hit the victim. Alex said it was "hard to tell" who this person was but confirmed it was the Defendant's wife or Aunt Joyce.

Alex made several other claims during the second CAC interview. He claimed that he could see through other people's eyes, that he could teleport and did so at least once that night, that he saw a tree full of apples dripping with blood, that the Defendant stabbed his hand, causing it to bleed profusely, and that the Defendant stabbed the victim with a large

sword-like knife.  However, there was no evidence to substantiate any of these claims.

On the day the victim was reported missing, a DCSO K-9 unit followed the victim's scent to a pond a few miles from the Defendant's house.  Law enforcement drained the pond and conducted an aerial search but found nothing significant.  Three days later, law enforcement executed a search warrant of the Defendant's home and found, among other things, the t-shirt the Defendant said he was wearing when he killed the victim.  Blood found on various clothing items and the center console of the Defendant's car tested positive for the Defendant's DNA and DNA from at least one unidentified individual.  However, investigators were unable to obtain a sample of the victim's DNA.  Twenty-four local, state, and federal agencies were involved in the investigation; however, the victim's body was never recovered.

Data from electronic devices found in the Defendant's home revealed that the Defendant's wife accepted a Facebook message request from a former sexual partner, on February 10, 2018, two months before the victim was reported missing.  On March 2nd, the Defendant's wife told her paramour that she was "falling for" him and had not "felt that way with [the Defendant] in a very long time."  She also wondered if she would be able to survive on her own by combining income from a job with the $1,200 disability payment she received each month to care for the victim.  The pair also reminisced about their first sexual encounter, which may have involved the Defendant, in explicit detail.  On March 22nd, the Defendant's wife told her paramour that she wanted to divorce the Defendant because she was "seriously . . . not happy" and had not been happy for a long time.  On March 28th, the pair made plans to visit each other and fantasized about the sexual encounters they would have.

There is no evidence that Defendant read the Facebook messages between his wife and her paramour.  However, data from the Defendant's cellphone reveals that on March 30th, five days before he reported the victim missing, he searched "anonymous parental test" on Google and visited a website for a company that sells DNA paternity tests.  Minutes later, he read an article entitled "How Can I Do a Secret Paternity Test Without Mom, Dad, or Child Knowing?" on DNATesting.com.  He then sent the following text message to his mother, "F**k this world by the time you see this message I'll be 6 ft. under." The day before the victim was reported missing, the Defendant's wife sent the Defendant a text message asking, "Hey where are you," to which Defendant responded, "Mental health."

Jenny Jones, a bail bond agent, testified that she lived down the street from the Defendant when the victim went missing.  At around 1:30 a.m. on April 4, 2018, roughly five hours before the victim was reported missing, Ms. Jones was driving home when she saw "[s]omeone standing on [a] bridge" wearing red shorts and a multi-colored shirt or

hoodie. TBI Special Agent Zachary Burkhart testified that the bridge was approximately 0.8 miles from the Defendant's house. A few days later, Ms. Jones saw a news report about the victim and reported what she saw to the police, identifying the person she saw on the bridge as the Defendant. She signed a written statement memorializing her account on April 23, 2018.

The State rested its case, and the Defendant did not offer proof. The jury convicted the Defendant of the lesser included offense of second-degree murder in count one and guilty as charged in the remaining counts of the presentment. The trial court merged the conviction of second-degree murder (count one) into the convictions for felony murder (count two) and aggravated child abuse (count three) and imposed an effective sentence of life imprisonment. For counts four and five, making a false police report and tampering with evidence, the court imposed a concurrent term of four and six years, respectively. The Defendant timely filed a motion for a new trial, which was denied by written order. The Defendant timely filed a notice of appeal on February 2, 2023, and this matter is now properly before this court.

## ANALYSIS

**I. Admissibility of Confession.** The Defendant contends the trial court erred in denying his motion to suppress his confession (1) because the State failed to corroborate his extrajudicial confession under the modified trustworthiness standard outlined in State v. Bishop, 431 S.W.3d 22 (Tenn. 2014); and (2) because his post-polygraph statements were obtained by law enforcement based on coercive interrogation techniques and after express promises of leniency. The Defendant argues the trial court erred in relying on Noah's hearsay statement as independent prima facie evidence of the victim's death and Alex's trial testimony as substantial independent evidence that corroborated the Defendant's confession. Because the State's proof is insufficient to prove the Defendant's guilt without his confession, the Defendant argues his conviction cannot stand. Alternatively, the Defendant contends his post-polygraph statements from April 6, 2018, should have been suppressed due to coercive interrogation techniques employed by TBI Agents Boyd and Faulkner. Despite his repeated claims of innocence, the investigators accused the Defendant of lying and made promises of leniency in exchange for a confession. Under these circumstances, the Defendant asserts his confession was involuntary and should have been excluded.

The State characterizes the Defendant's claim as challenging the sufficiency of the evidence and responds that the evidence is sufficient to support the Defendant's homicide and aggravated child abuse convictions. The State contends the Defendant's out-of-court confession was corroborated by Alex's testimony, who observed the Defendant carrying

- 12 -

the victim's lifeless body around the property, statements from Noah and Aunt Joyce that the victim was dead, and physical proof that suggests the Defendant's confession was trustworthy. The State emphasized the consistency between the Defendant's confession and Alex's trial testimony, the testimony of Jones, who observed the Defendant standing near a bridge around 1:30 on the morning of the victim's disappearance, and the implausibility of the victim, who had special needs, being able to unlock the door on his own. The State argues that the Defendant's claim merely points to evidence that contradicts the confession or the corroborating evidence, which are credibility issues to be resolved by the factfinder. Finally, the State contends the trial court correctly determined the Defendant's statement was voluntarily given because the Defendant spoke with law enforcement of his own free will, was advised of his constitutional rights, indicated he wanted to participate in questioning, was an educated individual, was not subject to threats or abuse, was in good physical and mental condition, and was not subject to a lengthy interrogation before the statement. For the reasons that follow, we agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial

evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275).

The State must still prove the corpus delicti beyond a reasonable doubt. State v. Cannon, 642 S.W.3d 401, 446 (Tenn. Crim. App. 2021) (citing State v. Shepherd, 902 S.W.2d 895, 901 (Tenn. 1995)). Corpus delicti, meaning literally "the body of the crime," consists of two elements: (1) the death of a human being; and (2) a criminal agency in producing that death. Id. (internal citations omitted). When the crime in question is a felony murder, as in this case, the corpus delicti of the crime is the crime-induced death of the victim, not the underlying or predicate felony. Bishop, 431 S.W.3d at 48. In establishing the corpus delicti, the State may proffer testimony of an eyewitness to the act or rely purely on circumstantial evidence. Id. (citing Berry v. State, 523 S.W.2d 371, 373 (Tenn. Crim. App. 1974)). Regardless of the State's method, the evidence must show that death or disappearance was not occasioned by accident, suicide, or natural causes. Id. (citing Shepherd, 902 S.W.2d at 901 and Davis v. State, 445 S.W.2d 933, 936 (1969)). "Whether the [S]tate has sufficiently established the corpus delicti is primarily a jury question." Id. (citing State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999)).

**1. Corroboration.** A trial court's determination that an extrajudicial confession is sufficiently corroborated is a legal conclusion, which we review de novo. However, to the extent that an accused's challenge to the determination of the trial court rests on disputed facts, we will defer to the findings of the trial court unless the record preponderates against them. Accordingly, the question of whether an extrajudicial confession is adequately corroborated is a mixed question of law and fact that appellate courts will review de novo. Bishop, 431 S.W.3d at 61-62.

The Defendant argues the corroboration requirement was not litigated before trial. This is not entirely true. The record reflects the Defendant filed a pre-trial motion to exclude his confession for lack of corroboration. At a hearing, the Defendant argued the trial court should rule on the Bishop issue before trial, while the State argued that "corroboration of a defendant's extrajudicial statement is not a requirement of admissibility." The trial court ruled it would decide whether the State introduced sufficient evidence to corroborate the confession after the jury reached a verdict if the Defendant filed a motion for a judgment of acquittal. After the Defendant filed a motion to reconsider, the trial court determined that it would be impractical to hold a pre-trial Bishop hearing and ruled that the confession would "not be admitted at trial until the State presents independent proof of corroboration." After Alex's testimony and other proof about the investigation, defense counsel reminded the court of their Bishop motion. Defense counsel argued there was no physical evidence to corroborate the portion of the confession that the Defendant beat the victim for fifteen or twenty minutes in the living room, that the Defendant took the victim's body into a field and returned home, or that the victim was

- 14 -

deceased. During a colloquy between defense counsel and the court, defense counsel conceded that Alex's testimony that he heard a loud thump, waited a while, came into the living room, saw the victim lying on the floor, and then the Defendant picked up the victim and carried the victim outside the door was "strong circumstantial evidence." However, defense counsel insisted there was no direct evidence that Alex witnessed the Defendant beat the victim to death.

After an extensive analysis of the relevant law, the trial court determined Alex's testimony constituted substantial independent evidence that the Defendant's confession was trustworthy and, in combination with Noah and Aunt Joyce's statements, constituted independent prima facie evidence of the victim's death. The court reasoned, in relevant part, as follows:

> In this case we have the testimony of an alleged eyewitness, Alex, who states that he was there and that he saw the [D]efendant come in. . . . [H]e went and told the [D]efendant that [the victim] had peed in the floor, the [D]efendant was in his room, he and [his wife] were both awake, and the [D]efendant went into the room and beat [the victim]. . . .

> . . . . Alex states that he saw [the Defendant] beat the child, that [Alex] went on back to sleep, and he later in the middle of the night heard a loud bang, that he waited a little bit to let things quiet down, that he walked out and saw [the victim] laying on the floor, he then saw the [D]efendant carry him out. More importantly, in this [c]ourt's mind, Alex's testimony was that he saw Noah standing and also being able to view what had taken place along with Aunt Joyce, and that he saw both of them and they had an opportunity to observe. And that he saw the [D]efendant carry [the victim] out the door and that he laid him at the back of the car, and that in fact he instructed Alex to help him with this situation and threatened him at some point. Made him help him, that he opened the door to the car and the trunk. . . .

> The [D]efendant's confession states that he beat the child and that Alex witnessed it. That's in my opinion a corroboration of that statement by – The [D]efendant is corroborated by Alex's testimony today. Alex's testimony corroborates the fact that Noah witnessed this . . . . [Alex] testified that Noah certainly had the opportunity to see what took place. . . .

> Based upon all of those facts, and the fact that [Alex] in response to the State's question stated the last time he saw his brother alive was on April 3, and the fact that the [victim] has never been recovered and that threats

- 15 -

have been made, I believe there is sufficient corroboration of both the corpus delicti, as there is, that the circumstantial evidence of the death of this child.

Our analysis of this issue begins with clarifying the procedure for analyzing corroborating evidence for a Bishop hearing. While evidence corroborating corpus delicti does not need to precede the introduction of the confession, our supreme court has stated that it is "best to do so; but if it came in the wrong order the Court would not reverse." Kyle v. State, 344 S.W.2d 537, 538 (1961); see Ashby v. State, 139 S.W. 872, 875 (1911); Murphy v. State, 426 S.W.2d 509 (1968) ("[A]dmitting the [defendant's] confession prior to the introduction of some evidence of corpus delicti. . . . [amounts] to no more than harmless error where corpus delicti is later established."). Although the trial court did not technically conduct a pretrial hearing to determine the admissibility of the confession, the court thoroughly vetted the corroboration issue mid-trial and before the jury was allowed to hear the Defendant's bare confession. The trial court exercised its gatekeeping function to determine the trustworthiness of the Defendant's confession before allowing it to be presented to the jury. Under these circumstances, the factual findings of the trial court are conclusive unless the evidence in the record preponderates against them.

In Bishop, the Tennessee Supreme Court adopted the modified trustworthiness standard for evaluating whether an extrajudicial statement is sufficiently corroborated. Bishop, 431 S.W.3d at 58; State v. Willis, 496 S.W.3d 653, 750 (Tenn. 2016). Under this standard, a defendant's extrajudicial confession is sufficient to support a conviction if the State presents "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss of injury." Bishop, 431 S.W.3d at 58 (internal citations and quotations omitted). The supreme court explained:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

Id. at 58-59 (footnotes and citations omitted). "Prima facie" evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." State v. Clark, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting Black's Law Dictionary 638-39 (9th

- 16 -

ed. 2009)). "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." Id. (quoting Black's Law Dictionary 640 (9th ed. 2009)).

The corroboration requirement is a low threshold. Clark, 452 S.W.3d at 280. Its purpose is twofold: to weed out false confessions to nonexistent crimes (by requiring some independent evidence that the injury occurred) and to weed out false confessions to actual crimes (by requiring some independent evidence that implicates the accused). Id. (citing Bishop, 431 S.W.3d at 59-60). The standard of proof required to clear this hurdle is even lower than the "preponderance of the evidence" standard. Id. (citing Bishop, 431 S.W.3d at 60 n.33 (quoting Smith v. United States, 348 U.S. 147, 156 (1954))).

To establish trustworthiness, independent evidence must corroborate essential facts included in the defendant's statement. Bishop, 431 S.W.3d at 60. The independent corroborating evidence need not establish by itself the offense beyond a reasonable doubt or by a preponderance of the evidence. Id. at 60 n.33. The independent evidence also need not establish each element of the offense. Id. However, independent evidence that only corroborates collateral circumstances surrounding the confession is insufficient to establish trustworthiness. Id. at 60. In presenting independent prima facie evidence that the injury actually occurred, the State is not required to establish that the injury resulted from a criminal act or link the defendant to the injury. Bishop, 431 S.W.3d at 59.

In this case, three of the Defendant's offenses of conviction, second-degree murder, first-degree felony murder, and aggravated child abuse, involve a tangible injury. Thus, the State needed to provide substantial independent evidence the Defendant's confession was trustworthy and independent prima facie evidence of the victim's death.

On appeal, the Defendant argues that Alex's testimony cannot be used to show that the Defendant's confession is trustworthy because Alex's testimony is untrustworthy. The Defendant asserts that Alex's testimony contradicts his previous statements to law enforcement and the forensic evidence in this case. In so arguing, the Defendant attacks the weight the trial court afforded the corroborative evidence rather than its admissibility. "[O]nce the State presents independent evidence establishing the prima facie trustworthiness of the defendant's extrajudicial confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy. Instead, contradictory evidence raises a credibility issue to be resolved by the factfinder." Bishop, 431 S.W.3d at 61 (citations omitted). As the fact finder, the trial court heard the forensic evidence the Defendant argues contradicts Alex's testimony, namely, the lack of any blood or DNA in the living room to substantiate that the victim was beaten to death, and defense counsel had the opportunity to cross-examine Alex about the discrepancies between his trial testimony

- 17 -

and the statements Alex initially provided to law enforcement. The trial court determined Alex's testimony was credible, and the record does not preponderate against the trial court's determination.

The Defendant also contends that Alex's testimony does not include "facts that establish the crime" and differs from the Defendant's confession to such an extent that it cannot be seen as corroborative. However, the Defendant's argument overstates the State's burden of proof under the modified trustworthiness standard. While some differences exist between Alex's testimony and the Defendant's confession, they contain the same essential facts. Alex's testimony and the Defendant's confession establish that Alex told the Defendant that the victim urinated on the floor sometime after going to bed, a detail that remains consistent in every statement Alex and the Defendant made to law enforcement. Alex's testimony and the Defendant's confession also establish that the Defendant physically punished the victim after learning he urinated on the floor and that both boys went back to bed shortly thereafter. Alex testified that he was awoken by a loud bang that "sounded like a thump." In his confession, the Defendant said he threw the victim's body onto the coffee table, which is consistent with the sound heard by Alex. The Defendant confessed the beating continued after he threw the victim onto the coffee table and did not end until the victim became unresponsive. This is consistent with Alex's testimony that he "waited for things to cool down" before leaving the bedroom.

Alex testified that he saw the Defendant pick the victim's body up off the floor and carry it outside, just as the Defendant said he did in his confession. In both versions of events, the Defendant threatened to harm Alex if he failed to assist the Defendant in some way, either by keeping quiet about the night's events or by assisting the Defendant with the victim's body. In addition to the similarities between the Defendant's confession and Alex's testimony, the fact that Alex testified as a witness corroborates the Defendant's confession because the Defendant repeatedly insisted that Alex was a witness. See Bishop, 431 S.W.3d at 60 (noting that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime").

Alex's testimony is not the only evidence corroborating essential facts of the Defendant's confession. Law enforcement found the shirt the Defendant said he wore that night when they searched his home. Jenny Jones testified that she saw the Defendant standing on a bridge wearing red shorts and a colorful top the night of the murder. Her description of the Defendant's clothing is consistent with the Defendant's confession. The Defendant confessed to carrying the victim's body outside the house and to leaving his property that night, which is consistent with Ms. Jones's testimony and Alex's statement

from his second CAC interview that he saw the Defendant dragging the victim's body somewhere "outside the house." Jones's testimony is also consistent with the Defendant's third post-confession statement that he disposed of the victim's body by throwing it off a bridge. Under the low threshold to evaluate corroboration of an extrajudicial statement, the above evidence corroborated the essential facts included in the Defendant's confession and constituted substantial independent evidence of its trustworthiness. Accordingly, we agree with the determination of the trial court and conclude the first prong of the modified trustworthiness standard is satisfied.

The second prong of the modified trustworthiness standard requires the State to introduce independent prima facie evidence of the victim's death. The trial court found the State had introduced independent prima facie evidence of the victim's death based on Alex's testimony that he last saw the victim alive on April 3, 2018, and that he saw the Defendant carrying the victim's body. The trial court also based its findings on the hearsay statements of Noah and Aunt Joyce and the fact that the victim's body was never recovered.

Here, the essence of the Defendant's claim is that there was no physical evidence corroborating the Defendant's extrajudicial statement. However, corroboration of the corpus delicti may be achieved with circumstantial evidence alone. State v. Housler, 193 S.W.3d 476, 490 (Tenn. 2006) (citing Jones, 15 S.W.3d at 891). The Defendant specifically argues the State failed to introduce prima facie evidence of an injury because there was no conclusive proof of the victim's death and because the victim's body was never recovered. The State argues that Alex's testimony, Noah and Aunt Joyce's hearsay statements, and the fact that a body was never found are prima facie evidence of the victim's death. We conclude the State introduced sufficient evidence at trial to satisfy Bishop's second prong based on the testimony of Alex and Noah's excited utterance, "Joe dead, Joe dead, Joe dead[.]" Neither Bishop nor Willis requires the State to recover a victim's body to satisfy the second prong of the modified trustworthiness standard in second-degree murder or first-degree felony murder cases.

The State argues, and we agree, that the fact the victim was never seen alive after Alex saw the Defendant carry his body around is prima facie evidence of the victim's death. The Defendant counters the State's argument via footnote with the statute that presumes a person is dead only after missing for seven years, and no equivalent absence occurred here. See Tenn. Code Ann. § 30-3-102. Again, we are not persuaded by the Defendant's attempts to restrict the State's ability to prove its case. The absence of a body does not preclude a conviction for murder so long as the corpus delicti can be proven by circumstantial evidence. See e.g., State v. Bondurant, No. 01C01-9501-CC-00023, 1996 WL 275021, at *8 (Tenn. Crim. App. May 24, 1996) (noting that the failure to recover a victim's body should not be fatal to the prosecution of a homicide because requiring a body would afford

absolute immunity to defendants who are cunning enough to destroy the body or otherwise conceal its identity); State v. James, No. W2007-00775-CCA-R3-CD, 2009 WL 636726, at *7 (Tenn. Crim. App. Mar. 10, 2009) (concluding that even though the victim's body was not recovered, the evidence produced at trial was sufficient to establish the elements of first degree premeditated murder beyond a reasonable doubt). In this case, Alex testified that he had not seen the victim alive since he saw the Defendant carry the victim's body outside and lay it on the ground before picking it back up and carrying it down the street into the night. At the time of trial, the victim, a developmentally delayed five-year-old autistic child who had been beaten until he was unresponsive and abandoned in a rural area, had been missing for three years despite an extensive search that involved over a dozen government agencies. Shortly after observing the victim lying on the floor in the living room, the victim's three-year-old brother Noah came into a room during the subsequent investigation and spontaneously uttered, "Joe dead, Joe dead, Joe dead[.]" Under the low threshold required to evaluate corroboration of extrajudicial statements, the above testimony constitutes independent prima facie evidence of the victim's death.

Accordingly, we conclude that there was sufficient, independent corroborating evidence both to permit the trial court to allow the Defendant's confessions into evidence and for the jury to find, beyond a reasonable doubt, that the Defendant was guilty of second-degree murder, first-degree felony murder, and aggravated child abuse.

**2. Voluntariness.** The Defendant contends his post-polygraph videotaped confession from April 6, 2018, should have been suppressed as involuntary. He argues the interrogators' repeated accusations of lying and a single offer of leniency to "tell [the detective] the truth and you will walk out that door" overcame his will and rendered his confession the product of coercion. The State argues the confession was not coerced because the Defendant voluntarily submitted to questioning, waived his Miranda rights, and did not confess to murdering the victim until well after the interrogator's supposed offer of leniency. We agree with the State.

Our review of the "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. McKinney, 669 S.W.3d 753, 764 (Tenn. 2023) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. Id. (internal citations and quotations omitted). "'[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial.'" Id. (quoting State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998)). However, this court reviews a trial court's application of law to the facts under a de novo standard of review with no presumption of correctness.

Id.  The voluntariness of a confession is a question of fact.  Willis, 496 S.W.3d at 695 (citing State v. Sanders, 452 S.W.3d 300, 305 (Tenn. 2014)).  The State has the burden of establishing the voluntariness of a confession by a preponderance of the evidence.  Id. (citing Sanders, 452 S.W.3d at 305).

The due process clauses of the Fifth Amendment and Fourteenth Amendment of the United States Constitution require a confession to be voluntary before its admission into evidence.  State v. Davidson, 509 S.W.3d 156, 189 (Tenn. 2016).  The due process voluntariness test is distinct from Miranda.  Id. (citing Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)); McKinney, 669 S.W.3d at 766.  The issue under Miranda is whether a suspect received certain warnings and knowingly and voluntarily waived certain rights, whereas the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion.  Id. (citing State v. Freeland, 451 S.W.3d 791, 815 (Tenn. 2014)); State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996)).  The voluntariness test includes an assessment of the psychological impact on the accused and an evaluation of the legal significance of the accused's reaction.  Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (citing Culombe v. Connecticut, 367 U.S. 568, 603 (1961)).  While the Miranda-waiver inquiry analyzes the knowing and voluntary nature of the waiver, the due process voluntariness inquiry is broader in scope, and analyzes whether a defendant was coerced into providing a statement.  McKinney, 669 S.W.3d at 766.  It is possible for a statement to be voluntary under a due process analysis but otherwise fail to abide by the requirements of Miranda.  Conversely, although it may be rare, it is possible for a defendant to be coerced into providing a statement after validly waiving his or her Miranda rights. McKinney, 669 S.W.3d at 766 (citing Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.")).

Whether a confession was made voluntarily must be determined by the totality of the circumstances, including the characteristics of the accused and the details of the interrogation.  Davidson, 509 S.W.3d at 189 (citing Dickerson, 530 U.S. at 434; Freeland, 451 S.W.3d at 815).  Relevant factors include the age, education, and intelligence of the accused; the extent of previous experience with law enforcement; whether questioning was repetitive and prolonged; the length of the detention prior to giving a statement; the lack of any advice to the accused of his constitutional rights; whether the accused was injured, intoxicated, drugged, or in ill health; deprivation of food, sleep, or medical attention; and physical abuse or threats of abuse.  Id. (citing State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013)).  "Coerced confessions are inherently unreliable."  Id. (citing Climer, 400 S.W.3d at 567-68).  For a statement to be voluntary, it "'must not be extracted by any sort of threats

or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

In this case, the Defendant does not dispute that he made a voluntary, knowing, and intelligent waiver of his Miranda rights to counsel and against self-incrimination during the April 6 videotaped interview. A valid waiver of Miranda rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights. In Tennessee, "[p]romises of leniency by state officers do not render subsequent confessions involuntary per se: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.'" Smith, 933 S.W.2d at 455 (quoting Kelly, 603 S.W.2d at 729). In determining whether or not a promise of leniency has "compelled" a statement, the court must examine "whether the behavior of the State's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." Kelly, 603 S.W.2d at 728 (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). Additionally, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." Smith, 933 S.W.2d at 455 (quoting State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." Id.

As relevant here, the Defendant filed a pre-trial motion to suppress his confession, arguing that the April 6 post-polygraph videotaped statement was involuntary based on Agent Boyd's express promise of leniency and that the Defendant never made an incriminating statement until Agent Boyd "promised him immunity by saying[,]"

> I told you that no matter what you tell me right now you tell me the truth – and you will walk out that door. You're walking out of here, okay? I promise you, I can promise you that.

The statement was made at 6:05 p.m., and the Defendant began to incriminate himself at 6:25 p.m. The Defendant insisted that his incriminating statement came after repeated denials of criminal conduct and was compelled by Agent Boyd's "promise of immunity."

At the April 1, 2021 hearing on the motion to suppress the April 6 videotaped statement "from 7:44 AM to 5:53 AM on 4/7/18," there was no testimony from Agent Boyd, Agent Faulkner, or the Defendant. The record reflects that Agent Faulkner was questioned about the April 6 videotaped confession in a different suppression hearing

challenging the illegality of the Defendant's arrest. During that hearing, Agent Faulkner denied that telling the Defendant that he could "walk out that door" if he told the truth was a part of the Reid technique. At trial, Agent Boyd denied using the Reid technique. Agent Boyd also said that during the April 6 videotaped interview he believed the Defendant was "leaving something out" and that he had a duty to explore the things he did not believe the Defendant was saying were true. Sergeant Daniels testified primarily about his interaction with the Defendant after the April 6 videotaped statement and the post-confession statements during the ride to locate the victim's body. He also said he provided the Defendant with Miranda warnings on April 4th, prior to conducting the computer voice stress test.

The Defendant's suppression hearing was continued, and on May 14, 2021, the Defendant called social psychologist Dr. Richard J. Ofshe, whom the State stipulated was an expert in "the field of research into police interrogation tactics." Dr. Ofshe testified that he reviewed "the interrogation in [the Defendant's case,]" and had prepared a report of his findings, which was admitted into evidence. Dr. Ofshe opined that Agents Boyd and Faulkner used the Reid technique to interrogate the Defendant. He explained that the Reid technique uses "evidence ploys" and "motivation tactics." Evidence ploys are statements that, if true, would tie a suspect to a crime, while motivation tactics are meant to convince a suspect it would be in their best interest to confess. Dr. Ofshe reviewed and analyzed the transcript of the videotaped confession from April 6 and identified various evidence ploys and motivational tactics used to elicit the Defendant's confession.

According to Dr. Ofshe, Agents Boyd and Faulkner primarily used the Defendant's polygraph test as an evidence ploy. Dr. Ofshe stated the polygraph test was "the only piece of evidence that is actually explicitly introduced." Although there was "no scientific support" for the validity of polygraph tests, Dr. Ofshe said the interrogators pointed to the Defendant's test results to accuse him of lying throughout the interrogation. Dr. Ofshe acknowledged that the Defendant successfully passed two prior computer voice stress tests, but he opined that the Defendant was unable to maintain his steadfast denial of harming the victim because the Defendant was unaware of the unreliability of the polygraph test evidence.

As a motivation tactic, Dr. Ofshe opined the interrogators suggested that what happened to the victim was accidental, and they implied the Defendant would "get a pass" if he admitted he did not mean to harm the victim. Dr. Ofshe said this motivation tactic was intentionally coercive. Dr. Ofshe was asked about the exchange between Agent Boyd and the Defendant during the videotaped confession when Agent Boyd asks the Defendant "to tell the truth," and the Defendant responds that he is telling him what he remembers. Agent Boyd then responds to the Defendant, "You are telling me what you remember

- 23 -

because you are worried about getting in trouble[.]" Dr. Ofshe rejected defense counsel's premise that Agent Boyd was impliedly threatening the Defendant. Asked if the Reid technique emphasized "blatant suggestions of threats and promises," Dr. Ofshe said, "No. . . . [under the Reid technique] you cannot obtain a confession by changing the suspect's reality." Dr. Ofshe characterized Agent Boyd's statement, "[If] you tell me the truth . . . you will walk out that door . . . I can promise you that," as "blatant promise" of leniency. Dr. Ofshe said that the Defendant began "trying to remember" what happened after Agent Boyd made this promise.

Dr. Ofshe said the Defendant relied on Agent Boyd's promise of leniency "through to the close of the interrogation, because [the Defendant refers] to the promise that he is going to be able to leave as one of the very last statements in the interrogation." Dr. Ofshe notes the Defendant initially said it's time to take me home, and then he thought his father would be angry, so he said take me to the hospital. In reliance on Agent Boyd's statement, Dr. Ofshe opined that the Defendant believed he was going home after the interrogation. Finally, Dr. Ofshe testified that he did not analyze the remaining portions of the Defendant's April 6 videotaped interrogation after the Defendant confessed to beating his son to death because he had not been provided with "empirical evidence" from the case, and he did not review the Agents testimony because they did not testify at the suppression hearing as he had anticipated.

On cross-examination, Dr. Ofshe confirmed that he was not a licensed clinical psychologist, had not personally interviewed the Defendant, and had not been provided with any corroborative evidence of the Defendant's statement by defense counsel. He confirmed that he was told by defense counsel that there was no corroborative evidence in this case. Although his report reflected that he had not been "'provided with any discovery suggesting that evidence consistent with [the Defendant's] speculations about how his son was killed has been found[,]'" Dr. Ofshe insisted that his conclusions were not informed by defense counsel's opinion that there was no corroboration in this case. Dr. Ofshe denied his opinion was based on defense counsel's assessment of the case. He conceded that to assess the Defendant's case, he needed an overview of the investigation, that he anticipated hearing the agent's testimony, and that that did not happen.

Upon being questioned about the Defendant's other confessions, Dr. Ofshe said he had not reviewed them to determine whether they contained coercive police tactics. Asked about a comment in his report that "the most solid piece of evidence" was the victim had been seen on the road, Dr. Ofshe agreed that he had received a report from defense counsel referencing a witness's statement that he had seen an individual on the road wearing clothing matching the description of clothing worn by the victim on the day the victim was reported missing. Dr. Ofshe conceded that he did not include that witness report in the list

of reports he had received from defense counsel. He agreed that he inferred from the witness report that the person the witness saw was the victim based on the clothing described, even though the report stated the person the witness saw "did not look like a kid[.]" He agreed he had not received the report of Jenny Jones having seen the Defendant in the early morning hours shortly before the victim was reported missing.

Ultimately, Dr. Ofshe did not conclude that the Defendant's confession was false, and he stated that he "never give[s] an opinion about whether or not a statement is true or false." He agreed that the focus of his report was to evaluate the coercive nature of the interrogation, which presupposes the underlying evidence. He agreed the findings of his report were contingent upon whether the Defendant's confession was corroborated by other evidence.

By written order on May 21, 2001, the trial court denied the Defendant's motion to suppress, determined that the Defendant's confession was voluntary, and provided:

> Prior to [the polygraph examination], Agent Faulkner advised the [D]efendant that he did not have to submit to the test, that he was free to leave and had not been charged with anything. The [[D]efendant stated that he wanted to "do this[.]" Agent Faulkner then went over the consent form for the polygraph which stated that he understood he could refuse the test, he could refuse to answer any question and could terminate the exam at any point. Agent Faulkner then went over the [D]efendant's Miranda rights, and the [D]efendant confirmed that he'd read and understood those rights and had no questions about his rights.

> During the polygraph interview, the [D]efendant stated that he'd had eight to nine hours of sleep the night before. While he had been diagnosed as bipolar and had a mental breakdown in 2016, which resulted in hospitalization, he'd taken his prescribed medication, was in overall good health, and was not aware of any physical or mental conditions that would affect his ability to answer questions. At the time, he was thirty years old, with no prior criminal records as an adult. His educational background included a degree from a technical school, and he had some college credits. He worked in I.T. and was in school for training in cyber security.

> Following the polygraph, the agents conducted an interview with the [D]efendant in which they confronted him with what they alleged were false statements. The interview lasted approximately four hours, and while Defendant repeatedly denied that he had harmed his son, he eventually

- 25 -

admitted that he beat the child repeatedly put him in the trunk of a car, and laid him in a field on McElhiney Road.

. . . .

 [T]he [D]efendant was an adult, with extensive education and training in a highly technical field, indicating a satisfactory level of intelligence. He had no prior experience with police as an adult but did have some juvenile issues. The questioning lasted for approximately four hours, and was persistent, but not extremely prolonged or hostile. He was advised of his Constitutional rights. He stated that he'd had adequate sleep the night before and knew of no physical or mental issues that would affect his ability to answer questions. He was not deprived of food or drink. He was not threatened physically. He was told that if he told the truth he would walk out of the door. He voluntarily went to the police station for the polygraph, stating, "I want to do it." He never asked to leave, never asked to stop the interview, and never asked for an attorney. Therefore, this Court finds that under the totality of the circumstances, the post-polygraph interview was not a custodial interrogation. . . . Further, the Court finds that the facts in this case demonstrate that the admission and statements made in the post-polygraph interview "were made voluntarily and not as the result of the Defendant's will being overborne by his interviewers."

The trial court specifically noted that it considered the testimony of defense expert Dr. Ofshe, "but in light of the fact that he did not have access to other admissions and statements of the defendant, the Court [did] not find his opinion to be a basis for determining that the techniques used by the investigators led the Defendant to make an involuntary confession." The court also considered the report of Dr. Kimberly Brown, introduced from a related hearing, and determined that her opinion that the Defendant's confession was "unsupported by factual evidence and inconsistent with the evidence" was limited to the evidence supplied by the defense. Because the trial had yet to occur, the court determined that the opinions of Drs. Ofshe and Brown were insufficient to support the conclusion that the Defendant's statement was involuntary.

Additionally, in denying the Defendant's motion for new trial on this issue, the trial court reasoned that although it had rejected the Defendant's challenge to the admissibility of his confession, it did not preclude Dr. Ofshe or Dr. Brown from testifying at trial regarding their opinion as to the truthfulness of the Defendant's confession. The trial court noted that not a "single witness had testified at trial that [the Defendant] had recanted his opinion. . . . There was much talk by the defense at the trial regarding the fact that this was

a false confession, that this was recanted, and so forth. But no one to my knowledge testified to that effect." The court noted that the truthfulness of the Defendant's confession was at issue, and none of the witnesses presented regarding how the Defendant's confession was obtained testified at trial.

Applying the above law to the instant case, we disagree with the Defendant that the circumstances of the interrogation were so coercive as to overbear his will. The Defendant was twice advised of his Miranda rights before being interviewed on April 6: first, by Sergeant Daniels in the Defendant's home on the evening of April 4, before submitting to the computer voice stress tests, and second at the start of the interview with Agents Boyd and Faulkner. On both occasions, the Defendant indicated that he understood his rights, signed a written form waiving them, and agreed to speak with the police.

> [A]dequate Miranda warnings [are] significant in our analysis because . . . "[i]t bears on the coerciveness of the circumstances, for it reveals that the police were aware of the suspect's rights and presumably prepared to honor them. And . . . it bears [on] the defendant's susceptibility, for it shows that the defendant was aware he had a right not to talk to the police."

State v. Griffin, 262 A.3d 44, 71 (Conn. 2021) (citing 2 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 6.2 (c), p. 712; McCarty, 468 U.S. at 433 (purpose of Miranda warning is to "ensure that the police do not coerce or trick captive suspects into confessing . . . [and] to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist" (emphasis, footnote, and internal quotation marks omitted))). We are unconvinced that this is one of those rare cases in which a defendant is coerced into providing a statement after validly waiving his or her Miranda rights. McCarty, 468 U.S. at 433 n.20; McKinney, 669 S.W.3d at 766.

We acknowledge the testimony of Dr. Ofshe, who opined that the agents' use of the polygraph examination was an evidence ploy and the principal reason the Defendant confessed. Here, we note that while polygraph results are generally inadmissible in court, both suspects and law enforcement officers place reliance on polygraph examinations. Suspects voluntarily submit to polygraph examinations to lift the cloud of suspicion, and law enforcement uses polygraph examination as an investigative tool in criminal cases. See State v. Vice, 961 N.W.2d 1, 9 (Wis. 2021) (citing Wyrick v. Fields, 459 U.S. 42, 43-46 (1982); Maryland v. Shatzer, 559 U.S. 98, 101-02 (2010)). It is "unreasonable" for a suspect in a post-polygraph interview to "assume that [he] would not be informed of the polygraph readings and asked to explain any unfavorable result." Wyrick, 459 U.S. at 49. Said differently, ignoring a defendant's examination in his post-polygraph interview would be like ignoring an elephant in the room. Vice, 961 N.W.2d at 14. Immediately following

the polygraph examination, the agents entered the room and stated that there was "no doubt that [the Defendant] was being untruthful." Throughout the post-polygraph interview the agents repeatedly said the Defendant was being untruthful in attempts to explore areas of their investigation that were inconsistent with the Defendant's prior statements. About an hour into the post-polygraph interview, after the Defendant questioned the agents about the results from the voice test and the polygraph exam, Agent Boyd tells him, "I'm not worried about the voice analyzer test. I don't trust them. What I trust is facts." Agent Faulkner then states, "We're not even talking about the polygraph." Under the circumstances of this case, we conclude the agents' use of the polygraph examination was not a coercive State action.

The Defendant's central claim is that Agent Boyd's subsequent comment that the Defendant could walk out the door if the Defendant told the truth was a "blatant promise of leniency." Once again, we acknowledge Dr. Ofshe's testimony on this issue and respectfully disagree. When viewed in context of the Defendant's confession, Agent Boyd's comment cannot reasonably be understood as a promise of immunity from prosecution or a promise of leniency. Agent Boyd's comment occurred after repeated statements from the agents that they knew the Defendant was "leaving something out," and the agent's assertions that someone else in the home may have done something to the victim. The agents insisted that if the Defendant did not do anything to the victim, he knew who did something to the victim and where the victim's body was located. When Agent Faulkner said that the Defendant was telling him what he wanted to hear to avoid "getting in trouble," Agent Boyd assured the Defendant that if he told him the truth, he could walk out the door. Viewed in context, Agent Boyd's statement is most reasonably understood to communicate to the Defendant that Agent Boyd had no present intent to arrest the Defendant, not to relay a promise of immunity from prosecution or leniency. See e.g., United States v. Haak, 884 F.3d 400, 413 (2d Cir. 2018). Our view is bolstered by the fact that after the Defendant confessed and toward the end of the interview, Agent Boyd asked the Defendant if he wanted to go home, and the Defendant told Agent Boyd he wanted to go to a hospital. Indeed, the Defendant was not arrested until April 7, after he provided a written, signed statement. Moreover, the Defendant did not rely on Agent Boyd's statement as a promise of immunity or leniency because the Defendant maintained his original version of events for nearly twenty-five minutes after the statement. The Defendant then changed his original version and told the agents he let the victim out of the house but did not remember much else. The Defendant continued to deny fatally harming the victim for another thirty minutes. After the Defendant confessed and toward the end of the interview, the Defendant asked Agent Faulkner, "What do they do for, like – like for this, like -" and Agent Faulkner replied, "Well, we can't tell you at this point, ok. It will be talked about later on[.]" These facts indicate the Defendant was not operating under Agent Boyd's statement as a promise of immunity from prosecution or leniency at the time

- 28 -

of confession and that Agent Boyd's statement did not compel the Defendant to confess.

Additionally, at the time of his interrogation, the Defendant was a relatively well-educated and intelligent thirty-year-old, having graduated from Dickson County High School, the Tennessee Technology Center, and a vocational certification program at Nashville State Community College. Although he had no prior adult criminal record, he had a juvenile record and thus had some experience with police. He was interviewed for roughly four-and-a-half hours (pre-polygraph interview approximately one and a half hours and polygraph examination approximately one hour) but was only subject to the kind of intense interrogation described by Dr. Ofshe for the last two-and-a-half hours of the post-polygraph interview. He drove to the interview voluntarily and was not detained beforehand. He was advised of his constitutional rights and signed a form voluntarily waiving those rights. Based on the Defendant's statement that he wanted to "do this" he appeared motivated to provide a statement and talk to the agents. He was not injured, intoxicated, or drugged before the interview. Although he had bipolar disorder type-one, he was managing it with psychiatric medication, which he had taken as directed before the interview. He stated he had about nine hours of sleep prior to the interview. He was not denied food or drink and did not require any medical assistance during the interview. Finally, he was not physically abused, nor was he threatened with abuse. All of these factors weigh in favor of a determination that the Defendant's videotaped confession was voluntary.

We conclude that the Defendant has failed to establish coercive conduct on the part of the State and failed to establish that his will was overborne. Accordingly, based on the totality of the circumstances surrounding the Defendant's statement, we hold that his statement was not "compelled" in violation of the Fifth Amendment of the United States Constitution or Article I, section 9 of the Tennessee Constitution.

**II. Hearsay Issue.** The Defendant also argues that the trial court abused its discretion in failing to exclude as hearsay utterances by the victim's three-year-old brother, "Joe dead, Joe dead, Joe dead," and the response of his Aunt Joyce, "Yes baby, Joe dead." The Defendant concedes the first two components of an excited utterance-the existence of a startling event and a statement that relates to that event were properly determined by the trial court. However, the Defendant disputes the third component that Noah and Aunt Joyce were in a state of distress or excitement at the time the emergency responders overheard their statements. The Defendant argues that his conviction should be overturned because the State relied on Noah and Aunt Joyce's statements, which were inadmissible hearsay, to corroborate his confession. The State contends that the trial court properly admitted these statements under the excited utterance exception.

The standard of review for rulings on hearsay evidence has multiple layers. A trial court's findings of fact and credibility determinations regarding hearsay are binding on this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, whether a statement is hearsay and whether a hearsay exception applies are questions of law and subject to de novo review. Id.

Generally, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Tennessee Rule of Evidence 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Under the excited utterance exception, the rule against hearsay does not exclude "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" State v. Franklin, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting State v. Land, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Otherwise explained, the rationale for admitting such statements is twofold:

> First, since this exception applies to statements where it is likely there was a lack of reflection—and potential fabrication—by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

State v. Gordon, 952 S.W.2d 817, 819-20 (Tenn. 1997) (citing Cohen, Paine & Sheppeard, Tennessee Law of Evidence § 803(2).1 at 532 (3d ed.1995)).

Three requirements must be met for a statement to qualify as an excited utterance: (1) a startling event or condition that suspend[s] the normal, reflective thought processes of the declarant, (2) the statement must relate to the startling event or condition, and (3) that the declarant made the statement while under the stress or excitement from the event or condition. Franklin, 308 S.W.3d at 823 (citations and internal quotation marks omitted). The third requirement, that the statement be made while the declarant is under the stress or excitement from the event or condition, relates most directly to the underlying rationale for the exception. Gordon, 952 S.W.2d at 820. The question of whether a statement "was

'made while the declarant was under the stress of excitement caused by the event'" is one of fact. State v. Gilley, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (quoting Tenn. R. Evid. 803(2)).

The "ultimate test" of whether a statement is admissible within the excited utterance exception is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." Franklin, 308 S.W.3d at 823 (quoting State v. Smith, 857 S.W.2d 1, 9 (Tenn.1993)) (internal quotation marks omitted). Gordon emphasized that the time interval is but one consideration in determining whether a statement was made under stress or excitement:

> Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.

952 S.W.2d at 820. The time interval is material only as a circumstance bearing on the issue of continuing stress. State v. Banks, 271 S.W.3d 90, 117 (Tenn. 2008) (citing Tennessee Law of Evidence § 8.07 [3][b] to [3][d], at 8-75 to 8-78) (rejecting a challenge to the admissibility of statement as excited utterance made four to six hours after the startling event).

The only competency requirement for an excited utterance under Rule 803(2) is that the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement. Land, 34 S.W.3d at 529 (citing Neil P. Cohen et al., Tennessee Law of Evidence § 803(2).3, at 535 and Tenn. R. Evid. 602). Thus, an excited utterance is inadmissible if the declarant lacks personal knowledge.

Here, about twelve hours after the victim was murdered, his little brother Noah said, "Joe dead, Joe dead, Joe dead," in the presence of emergency responders, and his Aunt Joyce responded, "Yes baby, Joe dead." The Defendant filed a motion in limine arguing that both statements were inadmissible hearsay. The State argued the statements were exceptions to hearsay as excited utterances, and the trial court agreed reasoning, in relevant part, as follows:

> In this case the court finds that the child and the aunt were in the house at the time of the alleged whatever took place. The event that took place and

the situation that led to this child being missing. They were there in the house. From the testimony at this point in this case has established the number of people who were inside the house and their identity. Noah and the aunt were in the house at the time.

Regarding [defense counsel's] argument that there's no proof that they had an opportunity or that they actually witnessed anything, that is true. There's no proof thus far that they witnessed anything. But it is proof that they were inside the house, and this house from the descriptions that have been seen by video and photograph is apparently a fairly modest mobile home possibly, a small structure, so that the individuals inside the home could have very easily been witnesses to something that occurred. They may not have. But the fact of the matter is, they had an opportunity in this [c]ourt's mind to observe something.

Secondly, even though this occurred at later in the morning, the statements occurred later in the morning, the [c]ourt finds that it was a situation where there were numerous individuals on the scene, that the investigators that have testified this morning were there to complete a Missing Child Report. The child at three years of age that came forward would clearly have been laboring, in this [c]ourt's opinion, under the excitement of all of these investigators and all of these people being in the house and the unusual circumstances that occurred. And that the aunt would have also been exposed to this type of situation.

The aunt's statement was a little more difficult for the [c]ourt to determine. I think the child's statement clearly meets the definition in all regards of the excited utterance. The aunt's response is somewhat more difficult, but in reading the case law, the State v. Franklin in particular, it's this [c]ourt's opinion that the aunt's response to the child could also be interpreted as an excited utterance. She responds to the child's statement, and in view of all of the commotion and chaos that was going on with the investigation, then this [c]ourt finds that both the aunt and the child would have been laboring under the excitement at that time[.]

First, the parties seemingly disagree regarding what the trial court determined was the startling event. The Defendant posits "the trial court did not find that either Noah or Aunt Joyce were reacting to the event they were discussing (i.e. [the victim's] disappearance). Instead, the trial court found that Noah was only reacting to the presence of law enforcement at the house, and then, presumably, Aunt Joyce was only reacting to

- 32 -

Noah's question." The State does not expressly provide its position on what the trial court determined to be the startling event, relies on the Defendant's concession, and states "the statements made by Noah and Joyce speak to the fate of [the victim], and the buzzing investigation []into the whereabouts of [the victim]."

We acknowledge that the ruling of the trial court is not entirely clear. However, we conclude that the trial court considered "the event that took place and the situation that led to [the victim] being missing" or the victim's abuse and subsequent death to be the startling event that precipitated the utterances of Noah and Aunt Joyce. Interpreting the court's ruling as the Defendant suggests would make the first two paragraphs of the court's reasoning obsolete. Moreover, our supreme court has held that while the "startling event" is usually the act upon which the legal controversy is based, the excited utterance exception "is not limited to statements arising directly from such events; rather, a subsequent startling event or condition which is related to the prior event can produce an excited utterance." Gordon, 952 S.W.2d at 820. Accordingly, even if Noah and Aunt Joyce's statements were made pursuant to the "subsequent startling event" of the investigation, this event, as well as their statements, clearly "related to the prior event" of witnessing the victim's abuse and subsequent death. State v. Williams, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *8 (Tenn. Crim. App. Nov. 29, 2006). The first two components of the excited utterance are easily satisfied. Being a witness to the death of the victim is undoubtedly a startling event that would cause significant stress or excitement, especially for a young child. See Banks, 271 S.W.3d 90. Noah and Aunt Joyce's statements directly relate to the victim's death. As alluded to by the trial court, the proof at trial also established the Defendant lived in a small, modest trailer home. Alex specifically testified that Noah and Aunt Joyce were in the living room and had an opportunity to observe the Defendant while the victim was lying on the floor. Under these circumstances, we conclude Noah and Aunt Joyce had personal knowledge of the victim's death, had an opportunity to observe the facts, and had personal knowledge of their extrajudicial statements.

We now focus our attention on the more difficult question of whether Noah and Aunt Joyce's statements were made while under the stress or excitement of the event or condition. We consider multiple factors in determining whether a statement was made under stress or excitement and, therefore, imbued with indicia of reliability. We are also mindful that the third component is "most directly" related to the underlying rationale for the excited utterance hearsay exception. Gordon, 952 S.W.2d at 820. While the time interval between the startling event and the utterance of the statement is significant, "spontaneity . . . is the essential test of admissibility [and] the lapse of time after the occurrence of an event is not as important as the condition of the speaker's mind." Williams, 2006 WL 3431920, at *9 (internal citations omitted). Some of the factors helpful in determining whether Noah made the statements under the stress or excitement of the

victim's death include his demeanor, age, and the severity of the startling event. Id. at *10 (affording considerable latitude in temporal proximity in cases involving assertions by very young children after a stressful experience . . . [because] children of tender years are generally not adept at reasoned reflection and concoction of false stories under such circumstances); State v. Wyma, No. E2007-01999-CCA-R3-CD, 2008 WL 11629342, at *9 (Tenn. Crim. App. Sept. 10, 2008) (admitting utterance of child abuse victim five days after the significant event and noting the significance that the victim uttered the statement spontaneously).

The record does not provide an exact timeframe between the startling event and the time Noah made the statement. The abuse was observed sometime after nine at night, and Noah's utterance was made at around nine the following morning. As such, there were approximately twelve hours between the startling event and the statement, a factor that does not weigh in favor of the statement's admissibility. However, Noah's age, three, and the severity of the startling event, witnessing the beating death of his brother, are factors that weigh in favor of the statement's admissibility. While there was very little evidence regarding his demeanor, Noah repeated the phrase "Joe dead" three times. The phrase was spontaneous and not in response to any questions. The phrase was described as being spoken in a loud tone or voice. Upon uttering the phrase, Aunt Joyce picked up Noah, an indication of comforting the child. The nature of the event, the beating death of his five-year-old autistic brother, and the spontaneous nature of the statement strongly support the conclusion that Noah was still laboring under the stress caused by the startling event at the time of the utterance. Because Noah made the statement during law enforcement's response to the disappearance of the victim also lends credence to our conclusion that the stress of the startling event was ongoing. Based on these factors, there is little likelihood that Noah's repeated and spontaneous utterance, "Joe dead" was fabricated or insincere. Accordingly, under the facts and circumstances of this case, we conclude that the trial court properly admitted Noah's statements under the excited utterance exception to the hearsay rule.

The same cannot be said about Aunt Joyce's response, "Yes baby, Joe dead." There was no proof concerning her age and demeanor. The record is devoid of any evidence concerning the circumstances of Aunt Joyce's response. The sole factor that weighs in favor of her response's admissibility is the severity of the event. Given the almost twelve hours between the startling event and Aunt Joyce's statement and the lack of proof, we cannot conclude that Aunt Joyce was laboring under the stress or excitement of the startling event when she said, "Yes baby, Joe dead." Accordingly, the trial court erred in admitting the response, "Yes baby, Joe dead." However, any error in the admission of Aunt Joyce's response was harmless because, as previously discussed, sufficient evidence exists to corroborate the Defendant's confession without it.

- 34 -

**III.** **Relevance of Facebook Messages.** The Defendant challenges the trial court's admission of his wife's Facebook messages into evidence, arguing that the messages were irrelevant and substantially more prejudicial than probative due to their sexually explicit nature. The State counters that the messages, along with the Defendant's cell phone data from the same period, were relevant to advance the State's theory at trial that the Defendant either lost control while punishing the victim or killed the victim to prevent Daniels from leaving him. The State further submits the messages carried a relatively low degree of prejudice toward the Defendant because there was only one message involving a sexual encounter of the Defendant and the rest involved Daniels. As such, the State contends the trial court did not abuse its discretion in admitting the evidence.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Otherwise, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Rule 403 "is narrow in its application" and parties "seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." State v. Saylor, 117 S.W.3d 239, 249 (Tenn. 2003) (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)) (internal quotation marks omitted).

The admissibility of evidence rests within the trial court's sound discretion, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. State v. Clayton, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). "Questions concerning . . . the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved

by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Here, the Defendant filed a motion in limine to exclude statements his wife made to law enforcement, arguing they were testimonial in nature and subject to exclusion under the confrontation clause. U.S. Const. amends. VI, XIV. The State agreed to exclude the statements before trial. However, at trial, the State sought to admit his wife's Facebook messages into evidence. The State argued the messages were relevant to the Defendant's motive and that the Defendant's motion in limine did not apply because the messages were non-testimonial. The Defendant then argued that the messages were irrelevant because there was no evidence the Defendant read them and that they were substantially more prejudicial than probative. The trial court found that the Defendant's contemporaneous text messages to his mother expressing suicidal ideation "circumstantially indicate[d] that [the Defendant] read [the Facebook messages] or was aware" that his wife considered leaving the Defendant for her paramour. The court also found that the messages were relevant "to show motive and intent" and that their "relevance outweigh[ed] any prejudice to the [D]efendant."

The Defendant's argues that the messages are irrelevant because they do not relate to the victim's death, and there is no proof the Defendant read them. While it is true the messages are not directly related to the victim's death, they need not be to clear the low bar for relevance under Rule 401. Similarly, the lack of direct evidence showing that Defendant read the messages goes to its weight, not admissibility. This is especially true in light of the trial court's finding that the Defendant's contemporaneous text messages "circumstantially indicate[d] that [the Defendant] read [the Facebook messages] or was aware" that his wife contemplated leaving him another man. The Defendant also argues that, even if he read the messages, they would only give him a motive to hurt his wife or her paramour, not the victim. We disagree. The Defendant searched the internet for information on surreptitious paternity tests just two days after his wife and her paramour discussed plans to visit each other and fantasized about the sexual encounters they would have at length. The trial court found that this set of facts put the Defendant's marital and mental stability into question, which, in turn, made them relevant to the issue of motive.

We conclude that the trial court did not abuse its discretion in finding the Facebook messages were relevant to the Defendant's motive. A jury could draw several reasonable inferences from the Facebook messages and the Defendant's cell phone data. The jury could have inferred that the Defendant came to suspect the victim was not his biological son after reading about his wife's past sexual encounters. Or perhaps, as the State argued at trial, the jury could have inferred that the Defendant saw that his wife asked her paramour if she could survive on her own by combining income from a job with the monthly disability payment she received to help care for the victim, concluded that his wife would

- 36 -

be unable to leave him if she was ineligible for the disability payment, and then decided to kill the victim.  These are all fact determinations for a jury to draw, and the Facebook messages were relevant to each.  We conclude the trial court did not abuse its discretion in finding that the probative value of the Facebook messages was not substantially outweighed by the risk of unfair prejudice.  Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.  However, as noted previously, the judgment form for count one erroneously reflects the Defendant was convicted of first-degree murder, and we remand count one for entry of corrected judgment to reflect the conviction offense of second-degree murder.

s/ Camille R. McMullen
CAMILLE R. MCMULLEN, PRESIDING JUDGE